# Exhibit A

**SOURCEFLEX**
**SOFTWARE SOURCE CODE ESCROW AGREEMENT**
**SOURCEFILE NUMBER: 7054**

This Software Source Code Escrow Agreement, dated as of January 22, 1994, by and between FileSafe, Inc., a California corporation, doing business as SourceFile ("SourceFile") located at 50 Crisp Plaza, Suite 700, San Francisco, CA 94124-2924 and POET Software, located at 999 Baker Way, San Mateo, CA ("Depositor"), and each Beneficiary identified by Depositor to SourceFile as provided for in Paragraph 3 hereof (each a "Beneficiary", collectively the "Beneficiaries").

**RECITALS:**

A. Pursuant to certain software license agreements (each a "License Agreement", collectively the "License Agreements"), Depositor licenses to certain licensees certain software in object code form (the "Software"). A description of each Software effective as of the date hereof, is attached hereto as Exhibit "A".

B. The Software is the proprietary and confidential information of Depositor, and Depositor desires to protect such ownership and confidentiality.

C. Depositor desires to ensure the availability to its Beneficiaries of the source code and all necessary proprietary information related to the Software (the "Source Material") in the event certain conditions set forth in Paragraph 4 of this Agreement should occur.

**AGREEMENT:**

1. Delivery of Source Code to SourceFile. Depositor shall deliver to SourceFile a parcel (the "Parcel") sealed by Depositor, which Depositor represents and warrants is two copies of the Source Material. SourceFile has no knowledge of, and makes no representations with respect to, the contents or substance of the Parcel, the Software or the Source Material.

2. Acknowledgement of Receipt by SourceFile. Promptly after receipt of the Parcel and of any supplements to the Source Material, SourceFile shall notify in writing such Beneficiaries for which Depositor has paid SourceFile the fee for such notice. Depositor shall provide supplements to the Source Material for each version of the Software. Depositor shall send to SourceFile a duplicate of the Source Material within three (3) days after receiving written notice from SourceFile that the Source Material has been destroyed or damaged. All supplements shall be subject to the terms and provisions of this Agreement. SourceFile will notify Beneficiary and Depositor of each update to the Source Material. Such notification will be sent via certified mail, return receipt required.

3. Acknowledgement by Beneficiaries. For purposes of this Agreement, a licensee of the Software shall be a Beneficiary hereunder with such rights of a Beneficiary as set forth herein, only if (i) such licensee is identified on the current schedule of Software licensees delivered to SourceFile by Depositor from time to time and (ii) such licensee has sent to SourceFile a fully executed copy of the form of acknowledgement attached hereto as Exhibit "B", in which such licensee accepts the terms of this Agreement. The name and addresses of the Beneficiaries shall be described in one or more schedules of Beneficiaries to be presented to SourceFile from time to time by Depositor. A schedule of Beneficiaries effective as of the date of this Agreement is attached hereto as Exhibit "C". All other licensees of the Software shall have no rights hereunder and SourceFile shall have no duties to such licensees.

4. Terms and Conditions of the Source Material Escrow. The Parcel shall be held by SourceFile upon the following terms and conditions:

(i) In the event that (1) SourceFile is notified by Beneficiary that Depositor is unwilling or unable to support or maintain the Software in breach of its License Agreement with Beneficiary and that the Beneficiary has given Depositor written notice of such breach (the "Release Condition") and (2) Beneficiary has paid to SourceFile all fees and charges then due and owing, SourceFile shall follow the following procedures set forth in this Section 4, parts (ii), (iii), (iv) and (v).

(ii) SourceFile shall promptly notify Depositor of the occurrence of the Release Condition and shall provide to Depositor a copy of Beneficiary's notice to SourceFile.

(iii) If SourceFile does not receive Contrary Instructions, as defined below, from Depositor within thirty (30) days following SourceFile's delivery of a copy of such notice to Depositor, SourceFile shall deliver a copy of the Source Material to Beneficiary. "Contrary Instructions" for the purposes of this Section 3 shall mean the filing of written notice with SourceFile by Depositor, with a copy to the Beneficiary demanding delivery, stating that the Release Condition has not occurred or has been cured.

(iv) If SourceFile receives Contrary Instructions from Depositor within thirty (30) days of the giving of such notice to Depositor, SourceFile shall not deliver a copy of the Source Material to the Beneficiary, but shall continue to store the Parcel until: (1) otherwise directed by the Depositor and Beneficiary jointly; (2) SourceFile has received a copy of an order of a court of competent jurisdiction directing SourceFile as to the disposition of the Source Material; or (3) SourceFile has deposited the Parcel with a court of competent jurisdiction or a Trustee or receiver selected by such court pursuant to this Section 4, part (v) below.

(v) Upon receipt of Contrary Instructions from Depositor, SourceFile shall have the absolute right, at SourceFile's election to file an action in interpleader requiring the Depositor and Beneficiary to answer and litigate their several claims

[illegible]



em

EW

and rights amongst themselves. SourceFile is hereby authorized to comply with the applicable interpleader statutes of the State of California in this regard.

5. Term of Agreement. This Agreement shall have an initial term of three (3) years. The term shall be automatically renewed on a yearly basis thereafter, unless Depositor or SourceFile notifies the other party in writing at least forty-five (45) days prior to the end of the then current term of its intention to terminate this Agreement.

6. Compensation of SourceFile. Depositor agrees to pay SourceFile reasonable compensation for the services to be rendered hereunder in accordance with SourceFile's then current schedule of fees, except that any fees associated with Escrow Release Requests and Technical Review/ Verification Requests initiated by a Beneficiary must be paid by that Beneficiary in accordance with SourceFile's then current schedule of fees. Depositor will pay or reimburse SourceFile upon request for all reasonable expenses, disbursements and advances, including software duplication charges and reasonable attorneys' fees, incurred or made by it in connection with carrying out its duties hereunder. SourceFile's schedule of fees for the initial term of this Agreement is attached to this Agreement as Exhibit "D".

7. Limitation of Duties of SourceFile. SourceFile undertakes to perform only such duties as are expressly set forth herein.

8. Limitation of Liability of SourceFile. SourceFile may rely on and shall suffer no liability as a result of acting or refraining from acting upon any written notice, instruction or request furnished to SourceFile hereunder which is reasonably believed by SourceFile to be genuine and to have been signed or presented by a person reasonably believed by SourceFile to be authorized to act on behalf of the parties hereto. SourceFile shall not be liable for any action taken by it in good faith and believed by it to be authorized or within the rights or powers conferred upon it by this Agreement. SourceFile may consult with counsel of its own choice, and shall have full and complete authorization and protection for any action taken or suffered by it hereunder in good faith and in accordance with the opinion of such counsel.

9. Indemnification of SourceFile. Depositor and Beneficiary agrees to indemnify and defend SourceFile and to hold it harmless from and against, any loss, liability or expense incurred by SourceFile, arising out of or in connection with this Agreement, carrying out its duties hereunder, any other claim of liability with respect to the Source Material. In the event suit is brought by any party to this Agreement, or any other party, as against any other party, including SourceFile, claiming any right they may have as against each other or against SourceFile, then in that event the parties hereto, agree to pay to SourceFile any attorney's fees and cost incurred by SourceFile in connection therewith.

10. Record Keeping and Inspection of Software. SourceFile shall maintain complete written records of all materials deposited by Depositor pursuant to this Agreement. During the term of this Agreement, Depositor shall be entitled at reasonable

times during normal business hours and upon reasonable notice to SourceFile to inspect the records of SourceFile maintained pursuant to this Agreement and to inspect the facilities of SourceFile and the physical condition of the Source Material.

11. Technical Verification. Beneficiary reserves the option to request SourceFile to verify the Source Material for completeness and accuracy. SourceFile may elect to perform the verification at its site or at the developers site. Depositor agrees to cooperate with SourceFile in the verification process by providing its facilities and computer systems and by permitting SourceFile and at least one employee of Beneficiary to be present during the verification of Source Material.

12. Restriction on Access to Software. Except as required to carry out its duties hereunder, SourceFile shall not permit any SourceFile employee, Beneficiary or any other person access to the Software except as provided herein, unless consented to in writing by Depositor. SourceFile shall use its best efforts to avoid unauthorized access to the Source Material by its employees or any other person.

13. Bankruptcy. Depositor and Beneficiary acknowledge that this Agreement is an "agreement supplementary to" the License Agreement as provided in Section 365 (n) of Title 11, United State Code (the "Bankruptcy Code"). Depositor acknowledges that if Depositor, as a debtor in possession or a trustee in Bankruptcy in a case under the Bankruptcy Code, rejects the License Agreement or this Agreement, Beneficiary may elect to retain its rights under the License Agreement and this Agreement as provided in Section 365 (n) of the Bankruptcy Code. Upon written request of Beneficiary to Depositor or the Bankruptcy Trustee, Depositor or such Bankruptcy Trustee shall not interfere with the rights of Beneficiary as provided in the License Agreement and this Agreement, including the right to obtain the Source Material from SourceFile.

14. Notices. Any notice or other communication required or permitted under this Agreement shall be in writing and shall be deemed to have been duly given on the date service is served personally, sent by overnight courier, or five (5) days after the date of mailing if sent registered mail, postage prepaid, return receipt required, and addressed as follows or to such other address or facsimile number as either party may, from time to time, designate in a written notice given in like manner:

**TO DEPOSITOR:** POET Software
999 Baker Way
Suite 100
San Mateo, California 94404
Telephone: 415-286-4640
Facsimile: 415-286-4630

NO.128 P29

**TO SOURCEFILE:** SourceFile
50 Crisp Plaza
Suite 700
San Francisco, California 94124-2924
Attn: Ms. Bea Strickland
Telephone: (415) 715-2733
Facsimile: (415) 822-7322

**TO BENEFICIARY:** As set forth in Exhibit "C" Schedule of Beneficiaries.

15. Miscellaneous Provisions.

(a) Waiver. Any term of this Agreement may be waived by the party entitled to the benefits thereof, provided that any such waiver must be in writing and signed by the party against whom the enforcement of the waiver is sought. No waiver of any condition, or of the breach of any provision of this Agreement, in any one or more instances, shall be deemed to be a further or continuing waiver of such condition or breach. Delay or failure to exercise any right or remedy shall not be deemed the waiver of that right or remedy.

(b) Modification or Amendment. Any modification or amendment of any provision of this Agreement must be in writing, signed by the parties hereto and dated subsequent to the date hereof.

(c) Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of California.

(d) Headings; Severability. The headings appearing at the beginning of the sections contained in this Agreement have been inserted for identification and reference purposes only and shall not be used to determine the construction or interpretation of this Agreement. If any provision of this Agreement is held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

(e) Further Assurances. The parties agree to perform all acts and execute all supplementary instruments or documents which may be reasonably necessary to carry out the provisions of this Agreement.

(f) Entire Agreement. This Agreement, including the attachments hereto, contains the entire understanding between the parties' and supersedes all previous communications, representations and contracts, oral or written, between the parties, with respect to the subject matter thereof. It is agreed and understood that this document and agreement shall be the whole and only agreement between the parties hereto with regard to these escrow instructions and the obligations of SourceFile herein in connection with this Agreement, and shall supersede and cancel any prior instructions. SourceFile is

specifically directed to follow these instructions only and Source. . shall have no responsibility to follow the terms of any prior agreements or oral understandings.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

**DEPOSITOR**

**POET Software**
**a Delaware Corporation**

By: [signature]

Name: Darin Medeiros

Title: Account Manager

**SOURCEFILE**

**FileSafe, Inc.,**
**a California corporation**

By: [signature]

Name: Ben Strickland

Title: Director

[illegible]

# EXHIBIT "B8"
## FORM OF ACKNOWLEDGEMENT BY BENEFICIARY

The undersigned hereby acknowledge, accepts and agrees to be bound by the terms of the attached SourceFlex Software Source Code Escrow Agreement by and between SourceFile, Inc., a California corporation, as Escrow Agent and POET Software, as Licensor, dated January 28, 1994.

**BENEFICIARY:** ______________________

______________________

Signature: ______________________
Name: ______________________
Title: ______________________
Address: ______________________

______________________

______________________

Telephone: ______________________
Facsimile: ______________________

**DEPOSITOR:**

POET Software
Mr. Darin Medeiros
999 Baker Way, Suite 100
San Mateo, CA 94404
Telephone:415-286-4640
Facsimile:415-286-4630

Please send CERTIFIED OR REGISTERED MAIL to:

**SOURCEFILE:**

SOURCEFILE
50 Crisp Plaza
Suite 700
San Francisco, California 94124-2924
Attn: Ms. Bea Strickland
Telephone (415) 715-2733
Facsimile (415) 822-4302

The following is a list of the Source Material Deposits placed in escrow with SourceFile for Beneficiary: POET 2.1 Source Code supported platforms. In addition POET will deposit future releases of their Source Code for all upcoming versions of POET once they are made available on any supported platforms.

[illegible]



TOTAL P.09

# EXHIBIT "A"
# DESCRIPTION OF SOURCE MATERIAL

**Source Material Deposit A:** POET 2.1 Source Code supported platforms. In addition POET will deposit future releases of their Source Code for all upcoming versions of POET once they are made available on any supported platforms.

**Source Material Deposit B:**________________________________________

**Source Material Deposit C:**________________________________________

**Source Material Deposit D:**________________________________________

SOURCEFILE Partner Number: ________
SOURCEFILE Escrow Agreement



# FIRST AMENDED AND RESTATED SOFTWARE OEM LICENSE AGREEMENT

**(Object Code)**

This First Amended and Restated Software OEM License Agreement ("Agreement") is entered into as of December 11, 1995, ("Effective Date") by and between POET Software Corporation, a Massachusetts corporation, having its principal place of business at 999 Baker Way, Suite 100, San Mateo, California 94404 ("POET"), and Echelon Corporation, a Delaware corporation having its principal place of business at 4015 Miranda Avenue, Palo Alto, California 94304 ("OEM"). This Agreement supersedes the Software OEM License Agreement between the parties having an effective date of December 11, 1995 (the "Original Agreement").

In consideration of the covenants and conditions contained herein, the parties agree as follows:

## 1. DEFINITIONS

1.1 "Licensed Software" shall mean the computer software programs identified in Exhibit A attached hereto, consisting of both Development Kit Versions and Runtime Versions, in object code form, any related documentation, including user documentation, provided with such software, and any Maintenance Releases (as defined in Section 4.2(a)) and Upgrades (as defined in Section 4.3) thereto provided to OEM under this Agreement.

1.2 "OEM Applications" shall mean the computer products generally described in Exhibit A, created by or on behalf of OEM or its Sublicensees and which incorporate a Runtime Version of the Licensed Software and are sold under OEM's or its Sublicensee's name.

1.3 "End-User" shall mean a customer to whom OEM or one of its Sublicensees permitted hereunder sublicenses an OEM Application for use by such customer for commercial, industrial, consumer or similar purposes in the regular course of such customer's business and not for resale. In the case of OEM's distribution of the OEM Application for internal use, OEM shall be deemed the End-User.

1.4 "Runtime Version" shall mean a version of the Licensed Software from which the POET API has been removed and that is intended to be incorporated in an OEM Application, and which will include the POET ODBC Driver software if OEM has paid the royalty for such driver as stated in Exhibit B. The Object Server database includes the following DLLs: PT400N42.DLL, PTBS4N42.DLL, PTCM4N42.DLL (Professional Edition), PTCM4N42.DLL (Personal Edition), PTEX2N42.DLL, PTIN4N42.DLL, PTMEMN42.DLL, PTSERV32.EXE and PTTM7N42.DLL, and any successor DLLs to any of the foregoing. The ODBC Driver includes the following DLLs:

POETODBC.HLP, PTDRM32.DLL, PTOQ1N42.DLL, PTSIM32.DLL, PTSTP32.DLL, and SIMSPY32.DLL, and any successor DLLs to any of the foregoing.

1.5 "Development Kit Version" shall mean a version of the Licensed Software that contains all the components that make up the Runtime Version plus the components listed in 1.4 above that have been removed from the Runtime Version and that is intended to be used by a software developer to create application software products incorporating Runtime Versions of the Licensed Software, such as the OEM Applications.

1.6 "Sublicensees" shall mean third parties who are manufacturers of hardware and/or software who distribute OEM's products and contract with OEM to distribute the OEM Applications.

2. GRANT OF RIGHTS

2.1 License. Subject to the terms and conditions of this Agreement, POET grants to OEM a nonexclusive, nontransferable, worldwide license to use Development Kit Versions of the Licensed Software to create the OEM Applications and to reproduce and distribute the OEM Applications solely in object code format and for use by End-Users. OEM may sublicense to Sublicensees the above rights to reproduce and distribute the OEM Applications, subject to obtaining from its Sublicensees written agreements reasonably restricting the rights of such Sublicensees to those permitted hereunder. OEM and its Sublicensees shall only distribute the Licensed Software as incorporated in the OEM Applications, and shall not directly or indirectly license the Licensed Software as a stand alone product, nor sublicense a third party to do so. OEM may install each licensed copy of the Professional Edition Development Kit Version on one network at a time to be used by one to four developers. OEM may only allow one developer at a time to use each copy of the Personal Edition Development Kit Version licensed hereunder.

2.2 Distribution of OEM Applications. OEM and its Sublicensees may exercise their respective rights to distribute the OEM Applications through subdistributors, resellers, and other third party distributors ("Subdistributors") subject to each such Subdistributor executing a written agreement containing provisions generally as restrictive as those set forth in this Agreement ("Subdistributor Agreement"). OEM will use commercially reasonable efforts to ensure that its Subdistributors abide by the terms of the Subdistributor Agreements and, upon request by POET, will keep POET apprised of its activities to enforce such provisions with particular Subdistributors.

2.3 End-User Sublicenses. Each End-User sublicense of an OEM Application granted by OEM or its Sublicensees shall be in the form of a shrink wrap agreement comparable to those commonly used in the computer industry. OEM shall provide POET a copy of its standard form of agreement to be used in granting End-User sublicenses to the OEM Applications and shall inform POET of any revisions to such sublicenses which materially impact POET's rights or the protection afforded the Licensed Software. OEM may make reasonable amendments to its End-User agreement in order to meet the requirements of its End-Users. OEM agrees to use commercially reasonable

efforts to enforce the obligations of its End-User agreements and to inform POET immediately of any known breach of such obligations.

2.4 Delivery. The parties acknowledge that POET has delivered a copy of the Professional Edition Development Kit Version to OEM and agree that such copy will be licensed to OEM pursuant to this Agreement, whose terms will supersede any terms of a shrink wrap license agreement delivered with such software.

2.5 No Other Rights. Except as expressly granted hereunder, POET grants no license, by implication, estoppel or otherwise to the Licensed Software. OEM may not copy the Licensed Software, except as necessary to utilize the licenses granted hereunder and except for a reasonable number of backup copies and may not modify the Licensed Software. OEM shall not decompile, reverse-engineer or otherwise attempt to derive or modify the Licensed Software source code, nor authorize or permit any third party to do so, subject to any prohibition of the foregoing restrictions imposed by applicable law. All rights not expressly granted to OEM are retained by POET or its licensors.

2.6 OEM Certification. OEM certifies that it is licensing the Licensed Software as an original equipment manufacturer and that the OEM Applications will be distributed by OEM with significant value added to the Licensed Software (in the form of software), as part of an integrated system or subsystem assembled by OEM, and in the regular course of OEM's business. Upon POET's reasonable request, OEM shall furnish to POET evidence of OEM's compliance with this Section 2.6.

3. COMPENSATION

3.1 License Fees. For each copy of the Development Kit Versions licensed by OEM hereunder, OEM shall pay POET the applicable license fee set forth in Exhibit B.

3.2 Royalties. OEM shall pay royalties for the ODBC Driver and for all copies of the OEM Applications distributed by OEM or reported to OEM with respect to distribution by its Sublicensees in the amounts or at the rates and at the times specified in Exhibit B.

3.3 Reports and Audit Rights. OEM shall make written reports in a form reasonably acceptable to POET of the copies of OEM Applications distributed and grant audit rights to POET as set forth in Exhibit B.

4. MAINTENANCE

4.1 Support for OEM Applications. OEM agrees that it shall be responsible for supporting its Sublicensees and End-Users of the OEM Applications. OEM will take reasonable steps to ensure that questions regarding the use or operation of the OEM Applications are addressed to and responded to by OEM, and OEM will not represent to any third party that POET is available to

answer any customer questions directly. POET shall refer any customer service questions relating to the OEM Applications to OEM.

4.2 Technical Support. In consideration of payment of the applicable technical support fees as set forth in Exhibit B, POET will provide technical support services ("Technical Support") to OEM for the Development Kit Versions and Runtime Versions licensed hereunder as specified below:

(a) Error Corrections; Maintenance Releases. POET shall use its commercially reasonable efforts to correct any reproducible programming errors identified in the Licensed Software and shall issue error-correction and minor update releases of such software ("Maintenance Releases") in accordance with the terms set forth in Exhibit C, with a level of effort commensurate with the severity of the error, provided that POET shall have no obligation to correct all errors in the Licensed Software. Upon identification of any programming error, in the Licensed Software, OEM shall notify POET of such error and provide POET with such information as OEM reasonably has available to assist POET in locating the error.

(b) Telephonic and Electronic Support. POET additionally shall provide OEM with reasonable support, both telephonically and electronically in accordance with POET's published Technical Support policies, which are set forth in Exhibit C, with regard to the use and operation of the Licensed Software for the purpose of assisting OEM to support the OEM Applications. Additional support, including consultation, may be made available upon request at POET's then current terms and rates.

4.3 Upgrades. POET will make Upgrades to the Development Kit Versions and Runtime Versions licensed hereunder available to OEM from time to time if and when available in consideration for payment of the applicable Upgrade charges as set forth in Exhibit B. POET shall not be obligated to provide Upgrades; however, if it provides Upgrades to others, it shall make such Upgrades equally available to OEM. Upon delivery, Upgrades shall be deemed to be part of the Licensed Software. OEM may distribute the OEM Applications incorporating Upgrades of the Runtime Versions to its Sublicensees and End-Users, subject to its acceptance of such Upgrades and payment of the required charges pursuant to Exhibit B. No charge shall be assessed by POET against such Sublicensees and End-Users in connection with the Upgrades. "Upgrades", as used in this Agreement, means new releases of the Licensed Software that increase the functionality or performance of the Licensed Software above and beyond correcting errors.

5. LIMITED WARRANTY

5.1 Warranties. POET warrants to OEM that, for a period of thirty (30) days from the date of delivery of the Licensed Software, the media on which the Licensed Software is furnished will, under normal use, be free from defects in material and workmanship.



5.2 Warranty of Authority. POET warrants that it has the right and power to grant the licenses granted OEM hereunder and that, after due inquiry, it is unaware of any infringement or misappropriation, or potential infringement or misappropriation, of the patent, copyright, trade secrets or other intellectual property rights of any third party by the Licensed Software or by the licenses granted hereunder. "Due inquiry" as used in this Section 5.2 shall not include a patent search.

5.3 Disclaimer. EXCEPT AS SPECIFICALLY WARRANTED ABOVE, THE LICENSED SOFTWARE IS PROVIDED "AS IS," AND POET MAKES NO OTHER WARRANTIES, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, WITH RESPECT TO ANY SUCH MATERIALS, AND POET SPECIFICALLY DISCLAIMS ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NONINFRINGEMENT. POET DOES NOT WARRANT THAT THE LICENSED SOFTWARE WILL MEET OEM'S OR ITS OR ITS SUBLICENSEES' END-USERS' REQUIREMENTS, THAT THE OPERATION OF THE LICENSED SOFTWARE WILL BE UNINTERRUPTED OR ERROR FREE, OR THAT DEFECTS IN THE LICENSED SOFTWARE WILL BE CORRECTED. FURTHERMORE, POET DOES NOT WARRANT OR MAKE ANY REPRESENTATIONS REGARDING THE RESULTS OF THE USE OF THE LICENSED SOFTWARE IN TERMS OF CORRECTNESS, ACCURACY, RELIABILITY OR OTHERWISE.

6. TERM AND TERMINATION

6.1 Term. This Agreement shall commence upon the Effective Date and shall continue in force, unless terminated earlier under the terms of this Section 6.

6.2 Termination. This Agreement may be terminated by either party upon notice, if the other party breaches any material term or condition of this Agreement and fails to remedy the breach within thirty (30) days after being given notice thereof or, in the event such breach is not reasonably susceptible of cure within thirty (30) days, such longer period as is reasonably necessary.

6.3 Termination for Convenience. OEM may terminate this Agreement for convenience upon sixty (60) days prior written notice to POET. Additionally, OEM may terminate this Agreement for convenience, immediately upon notice, prior to the first commercial release of any OEM Application.

6.4 Effect of Termination. In the event this Agreement is terminated, OEM's rights to distribute the OEM Applications under this Agreement and its rights to authorize others to use and distribute the OEM Applications shall be terminated; provided, however, that (i) each End-User's right to use OEM Applications previously licensed to it by OEM or its Sublicensees shall survive, and (ii) OEM, its Sublicensees and Subdistributors may continue to distribute OEM Applications in inventory as of the date of termination of this Agreement, subject to OEM's payment of the royalties applicable to such distribution. Subject to the terms of this Section 6.4, within thirty (30) days after the termination of this Agreement, OEM will prepare all copies of the Licensed Software and other POET materials provided hereunder in OEM's possession or control for shipment to POET and return

them to POET, or destroy such materials as POET may direct. Upon termination of this Agreement, neither party will retain any copies of any Confidential Information which may have been entrusted to it by the other party and, within thirty (30) days of the effective date of termination an officer of each party shall certify to the other party that all copies of Confidential Information of the other party received hereunder have been returned or destroyed. Notwithstanding the foregoing, OEM may retain one (1) copy of each edition and version of the Licensed Software used or distributed by OEM in conjunction with OEM Applications and related documentation and may use such materials internally as is necessary to support its Sublicensees and/or installed End-User base and may continue to receive Technical Support and all other error corrections supplied by POET to its other licensees for the benefit of Sublicensees and/or End-Users existing as of the date of termination of this Agreement, upon payment of the applicable fees as provided in Exhibit B, part 5. If such error corrections are not available independently of Upgrades made available by POET, then POET will supply such Upgrades, and OEM shall have the right to distribute such Upgrades to Sublicensess and/or End-Users existing as of the date of termination of this Agreement, provided that OEM pays POET the applicable royalties for such Upgrades.

6.5 Limitation. In the event of termination by either party in accordance with any of the provisions of this Agreement, neither party shall be liable to the other because of such termination, for compensation, reimbursement or damages on account of the loss of prospective profits or anticipated sales or on account of expenditures, inventory, investment, leases or commitments in connection with the business or goodwill of POET or OEM. Termination shall not, however, relieve either party of obligations incurred prior to the termination.

6.6 Survival of Provisions. The provisions of Sections 2.6, 3, 4.1, 5, 6.4, 6.5, 6.6, 7, 8, 9, 10 and 11 and the relevant provisions of Sections 1 and 12 shall survive the termination of this Agreement for any reason. All other rights and obligations of the parties shall cease upon termination of this Agreement.

## 7. PROPERTY RIGHTS

7.1 Property Rights. OEM acknowledges and agrees that, as between OEM and POET, POET owns all right, title, and interest in the Licensed Software now or hereafter subject to this Agreement, and in all of POET's patents, trademarks, trade names, copyrights, and trade secrets relating to the design, manufacture, marketing, operation or service of the Licensed Software. The use by OEM of any of these property rights is authorized only for the purposes herein set forth and upon termination of this Agreement for any reason such authorization will cease, subject to the provisions of Section 6.4.

7.2 Proprietary Notices. OEM shall not remove and shall instruct its Sublicensees not to remove, any copyright notices or proprietary legends contained within the Licensed Software. OEM agrees to indicate in OEM's documentation for the OEM Applications that such product contains copyrighted material of OEM.

8. <u>CONFIDENTIAL INFORMATION</u>.

8.1 <u>Definition</u>. As used in this Agreement, the term "Confidential Information" shall mean any information disclosed by one party to the other pursuant to this Agreement which is in written, graphic, machine readable or other tangible form and is marked "Confidential", "Proprietary" or in some other manner to indicate its confidential nature. Confidential Information may also include oral information disclosed by one party to the other pursuant to this Agreement, provided that such information is designated as confidential at the time of disclosure and is reduced to a written summary of Confidential Information by the disclosing party, which summary is marked "Confidential," "Proprietary" or in some other manner to indicate its confidential nature and delivered to the receiving party within thirty (30) days after its oral disclosure. Notwithstanding the foregoing, the Licensed Software shall be deemed the Confidential Information of POET without the necessity of marking; provided, however, that any OEM Application incorporating the Licensed Software shall not be deemed to be Confidential Information.

8.2 <u>General</u>. Each party shall treat as confidential all Confidential Information of the other party, shall not use such Confidential Information except as expressly set forth herein or otherwise authorized in writing, shall implement reasonable procedures to prohibit the disclosure, unauthorized duplication, misuse or removal of the other party's Confidential Information and shall not disclose such Confidential Information to any third party, except as may be necessary and required in connection with the rights and obligations of such party under this Agreement and subject to confidentiality and nonuse obligations at least as protective as those set forth herein. Without limiting the foregoing, each of the parties shall use at least the same procedures and degree of care which it uses to prevent the disclosure of its own confidential information of like importance to prevent the disclosure of Confidential Information disclosed to it by the other party under this Agreement, but in no event less than reasonable care. The parties further agree to keep confidential the terms and conditions of this Agreement.

8.3 <u>Exceptions</u>. Notwithstanding the above, neither party shall have liability to the other with regard to any Confidential Information of the other which: (i) was generally known and available in the public domain at the time it was disclosed or becomes generally known and available in the public domain through no fault of the receiver; (ii) was known to the receiver at the time of disclosure as shown by the files of the receiver in existence at the time of disclosure; (iii) is disclosed with the prior written approval of the discloser; (iv) was independently developed by the receiver without any use of the discloser's Confidential Information and by employees or other agents of the receiver who have not been exposed to such Confidential Information; (v) becomes known to the receiver from a source other than the discloser without breach of this Agreement by the receiver and otherwise not in violation of the discloser's rights; (vi) is intentionally released or disclosed by the discloser without restriction on further disclosure; or (vii) is required to be disclosed by law (provided that, prior to such disclosure, the receiver shall provide prompt notice thereof to the discloser to enable the discloser to seek a protective order or otherwise prevent each disclosure, and, further, shall take reasonable steps to limit the breadth of such disclosure).



8.4 Employee Agreements. Each party shall obtain the execution of non-disclosure agreements with its employees, agents and consultants having access to Confidential Information of the other party, and shall diligently enforce such agreements.

9. BACK-UP SOURCE CODE LICENSE.

9.1 Source Code Escrow. POET agrees to deposit the computer software programs identified in Exhibit A attached hereto, in source code form (the "Source Materials"), into escrow with an escrow agent upon the terms and conditions set forth in Exhibit D (the "Escrow Agreement"). In the event ("Triggering Event") POET (or its successors or assigns) fails to support or maintain the Licensed Software as provided in this Agreement, where such failure has continued for thirty (30) days after OEM has given written notice thereof to POET, and if OEM is not then in material breach of this Agreement, OEM may obtain release of the Source Materials pursuant to the source code escrow agreement with the escrow agent and use them pursuant to the license granted in Section 9.2. below. By the terms of the escrow agreement, OEM shall have the right to release of the Source Materials upon presentation of a certificate of an officer of OEM stating that a Triggering Event has occurred. If POET disputes the occurrences of a Triggering Event, POET shall deliver to OEM a notice of such dispute, and the parties shall submit such dispute to arbitration under the Commercial Arbitration Rules of the American Arbitration Association by three (3) arbitrators appointed in accordance with such rules and subject to the following additional conditions: Such arbitration shall commence within ten (10) days of OEM's receipt of POET's notice of dispute, and the only question for the arbitrators' consideration shall be whether or not a Triggering Event occurred prior to OEM's notification thereof to the escrow agent. The parties shall each bear one-half of the expenses of the arbitration, except that if the arbitrators determine that a Triggering Event did not then occur, OEM shall pay or reimburse POET for POET's one-half of the arbitration expenses. The parties shall ensure that the escrow agreement include the foregoing terms in this Section 9.1. If the arbitrators decide in favor of POET, OEM shall immediately return the Source Materials to the escrow agent and shall not retain any copies thereof. If OEM returns all materials as required herein and pays such arbitration fees, then OEM shall not be liable to POET for any infringement for use of the Source Materials during the period after they were wrongfully obtained, as determined by the arbitrators. OEM agrees to pay to POET $1,000 for escrow set up costs and $500 annually for maintenance of OEM as a beneficiary under the Escrow Agreement, with payments to be made by POET to the escrow agent at times called for in the Escrow Agreement.

9.2 Source Code License and Grant Back. Subject to the terms and conditions of this Agreement, POET hereby grants OEM a nonexclusive, nontransferable license to use, modify and create derivative works of the Source Materials solely for the purpose of exercising its rights to distribute object code copies of the OEM Applications pursuant to the license granted under Section 2 above and supporting its Sublicensees and End-Users of the OEM Applications. OEM agrees not to exercise this license unless and until the occurrence of a Triggering Event. Title in all Source Materials will remain in POET. In case of exercise of the license granted to OEM in this Section 9.2, OEM agrees to grant and does hereby grant POET a non-exclusive, worldwide, perpetual, irrevocable, royalty-free, fully paid right and license to copy, use, modify, create derivative

work of and distribute and sublicense all modifications and derivative works of the Source Materials created by or for OEM and modifications and derivative works thereof created by or for POET.

9.3 Third Party Access to Source Materials. If a Sublicensee requires of OEM that the Source Materials be placed in escrow in connection with an escrow arrangement placing OEM's proprietary software source code for an OEM Application in escrow, OEM may request of POET that the Source Materials for such OEM Application being held for OEM be also held in POET's escrow account for the benefit of such Sublicensee and be made available for use by such Sublicensee on the following conditions: (i) such Sublicensee has obtained out of escrow OEM's proprietary source code for such OEM Application and (ii) such Sublicensee requires maintenance of the Licensed Software for such OEM Application and POET has refused or failed to provide such maintenance for such Sublicensee in a timely manner. POET's consent to entering into such an escrow arrangement with such Sublicensee will not be unreasonably withheld.

## 10. INTELLECTUAL PROPERTY INDEMNITY

10.1 Indemnification by POET. OEM agrees that POET has the right to defend, or at its option to settle, and POET agrees, at its own expense, to defend or at its option to settle, any claim, suit or proceeding brought against OEM, and POET agrees to pay, subject to the limitations hereinafter set forth, any final judgment entered against OEM or its customers on such issue in any such suit or proceeding, alleging that use of the Licensed Software or distribution of the Licensed Software as part of any OEM Application as contemplated hereunder infringes or misappropriates any U.S. or German patent or any copyright, trade secret, or trademark, (collectively, "Intellectual Property Right") of any third party, subject to the limitations hereinafter set forth. OEM agrees that POET, at its sole option, will be relieved of the foregoing obligation unless OEM (i) notifies POET promptly in writing of such claim, suit or proceeding, (ii) provides POET with sole control of any such action or settlement negotiations (provided, however, that POET shall obtain OEM's consent, which will not unreasonably be withheld, prior to effecting any settlement which impacts OEM's rights hereunder), and (iii) gives POET authority to proceed as contemplated herein, and, at POET's expense, gives POET proper and reasonable information and assistance to settle and/or defend any such claim, suit or proceeding. If it is adjudicatively determined, or if POET believes it may be determined, that the Licensed Software infringes any Intellectual Property Right, then POET may, at its option: (i) procure for OEM the right under such Intellectual Property Right to use such Licensed Software and to use and distribute such OEM Application as contemplated herein; (ii) replace the Licensed Software with other functionally equivalent software; or (iii) modify the Licensed Software so that it is no longer infringing. POET will not be liable for any costs or expenses incurred without its prior written authorization.

10.2 Limitation on POET's Liability. Notwithstanding the provisions of subsection 10.1 above, POET assumes no liability to the extent such claims are based on (i) combination of the Licensed Software with software or hardware not provided by POET (if the infringement would have been avoided by use of the Licensed Software alone); (ii) any marking or branding not applied by POET or involving any marking or branding applied at the request of OEM; or (iii) any modification

of the Licensed Software, or any part thereof, unless such modification was made by POET (if the infringement would have ben avoided without such modification).

10.3 Indemnification by OEM. POET agrees that OEM has the right to defend, or at its option to settle, and OEM agrees, at its own expense, to defend or at its option to settle, any claim, suit or proceeding brought against POET, and OEM agrees to pay, subject to the limitations hereinafter set forth, any final judgment entered against POET on such issue in any such suit or proceeding, alleging that use of any OEM Application or distribution of any OEM Application infringes or misappropriates any Intellectual Property Right of any third party, subject to the limitations hereinafter set forth. POET agrees that OEM, at its sole option, will be relieved of the foregoing obligation unless POET (i) notifies OEM promptly in writing of such claim, suit or proceeding, (ii) provides OEM with sole control of any such action or settlement negotiations (provided, however, that OEM shall obtain POET's consent, which will not unreasonably be withheld, prior to effecting any settlement which impacts POET's rights hereunder), and (iii) gives OEM authority to proceed as contemplated herein, and, at OEM's expense, gives OEM proper and reasonable information and assistance to settle and/or defend any such claim, suit or proceeding. If it is adjudicatively determined, or if OEM believes it may be determined, that the OEM Application infringes any Intellectual Property Right, then OEM may, at its option, terminate this Agreement upon notice to POET. OEM will not be liable for any costs or expenses incurred without its prior written authorization.

10.4 Limitation on OEM's Liability. Notwithstanding the provisions of subsection 10.3 above, OEM assumes no liability to the extent such claims relate to (i) the Licensed Software (including, without limitation, the Runtime Versions thereof); or (ii) any marking or branding applied by POET and not applied at the specific request of OEM.

10.5 ENTIRE LIABILITY. THE FOREGOING PROVISIONS OF THIS SECTION 10 STATE THE ENTIRE LIABILITY AND OBLIGATIONS OF EACH PARTY, AND THE EXCLUSIVE REMEDY OF THE OTHER PARTY, WITH RESPECT TO THE INFRINGEMENT OF ANY PATENT, COPYRIGHT, TRADEMARK, TRADE SECRET OR OTHER INTELLECTUAL PROPERTY RIGHT BY THE TRANSACTIONS CONTEMPLATED HEREUNDER.

## 11. LIMITED LIABILITY

EXCEPT AS PROVIDED IN SECTIONS 8 AND 10, THE LIABILITY OF EACH PARTY ARISING OUT OF THIS AGREEMENT, THE TERMINATION THEREOF, AND/OR THE PROVISION OF GOODS OR SERVICES HEREUNDER WILL BE LIMITED TO THE AMOUNT PAID BY OEM HEREUNDER. IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER OR ANY OTHER ENTITY (EXCEPT AS PROVIDED IN SECTION 10) FOR LOSS OF DATA, COSTS OF PROCUREMENT OF SUBSTITUTE GOODS OR SERVICES OR ANY SPECIAL, CONSEQUENTIAL OR INCIDENTAL DAMAGES, UNDER ANY CAUSE OF ACTION, WHETHER FOR BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE),

OR OTHERWISE, AND WHETHER OR NOT SUCH PARTY OR ITS AGENTS HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE. THIS LIMITATION WILL APPLY NOTWITHSTANDING ANY FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY PROVIDED HEREIN.

THE FOREGOING WILL NOT AFFECT EITHER PARTY'S LIABILITY, IF ANY, THAT MAY BE IMPOSED BY LAW WITH RESPECT TO CONTRIBUTION OR INDEMNITY FOR THIRD PARTY CLAIMS FOR PERSONAL INJURY, DEATH OR PHYSICAL DAMAGE TO PROPERTY.

12. MISCELLANEOUS

12.1 Governing Law. This Agreement shall be governed by and interpreted in accordance with the laws of California without reference to conflict of laws principles.

12.2 Assignment. Except in the event of a sale of substantially all of its assets to which this Agreement relates or in the event of a merger or acquisition and provided the assignee agrees in writing to be bound by all the terms and conditions of this Agreement, OEM may not assign or delegate this Agreement or any of its licenses, rights or duties under this Agreement, directly or indirectly, by operation of law or otherwise, without the prior written consent of POET, which shall not unreasonably be withheld. Any such attempted assignment or delegation shall be void. Except as provided above, this Agreement shall inure to the benefit of each party's successors and assigns.

12.3 Authority. Each party represents that all corporate action necessary for the authorization, execution and delivery of this Agreement by such party and the performance of its obligations hereunder has been taken.

12.4 Notices. All notices and other communications required or permitted hereunder shall be in writing and shall be mailed by registered or certified mail, postage prepaid, or delivered by hand, by messenger or by facsimile, addressed to the addresses first set forth above or at such other address with which the other party has been furnished with a notice in the manner set forth herein. Such notices shall be deemed to have been served when received.

12.5 Partial Invalidity. If any paragraph, provision, or clause thereof in this Agreement shall be found or be held to be invalid or unenforceable in any jurisdiction in which this Agreement is being performed, the remainder of this Agreement shall be valid and enforceable.

12.6 Counterparts. This Agreement may be executed in two (2) counterparts, which, taken together, shall be regarded as one and the same instrument.

12.7 Waiver. The failure of either party to enforce at any time the provisions of this Agreement shall not be considered a present or future waiver of such provisions, nor in any way affect the ability of either party to enforce each and every such provision thereafter.





12.8 Independent Contractors. The relationship of POET and OEM established by this Agreement is that of independent contractors, and nothing contained in this Agreement shall be construed to constitute the parties as partners, joint venturers, co-owners or otherwise as participants in a joint or common undertaking, or allow either party to create or assume any obligation on behalf of the other. All financial obligations associated with a party's business are the sole responsibility of such party.

12.9 Import and Export Controls. Any and all obligations of POET to provide the Licensed Software, as well as any technical assistance, will be subject in all respects to such United States laws and regulations as will from time to time govern the license and delivery of technology and products abroad by persons subject to the jurisdiction of the United States, including the Export Administration Act of 1979, as amended, any successor legislation, and the Export Administration Regulations issued by the Department of Commerce, Bureau of Export Administration. OEM agrees that it will not export or re-export the Licensed Software except in compliance with all such export laws and regulations.

12.10 Entire Agreement. The terms and conditions herein contained, including those in Exhibits A, B, C and D, which are hereby incorporated herein by reference, constitute the entire agreement between the parties and supersede all previous agreements and understandings, including the Original Agreement, whether oral or written, between the parties hereto with respect to the subject matter hereof, and no agreement or understanding varying or extending the same shall be binding upon either party hereto unless in a written document signed by the party to be bound thereby.

12.11 Force Majeure. Nonperformance of either party, except the payment of money, shall be excused to the extent that performance is rendered impossible by strike, fire, flood, governmental acts or orders or restrictions, failure of suppliers, or any other reason where failure to perform is beyond the reasonable control of and is not caused by the negligence of the nonperforming party.

12.12 IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be signed by duly authorized officers or representatives as of the date first above written.

| POET SOFTWARE CORPORATION | ECHELON CORPORATION |
| --- | --- |
| By: [signature] | By: [signature] |
| Name: Jerry Wolf | Name: OLIVER R. STANFIELD |
| Title: V.P. of Finance | Title: VP & CFO |

# EXHIBIT A

## LICENSED SOFTWARE AND OEM APPLICATION

LICENSED SOFTWARE:

1. Development Kit Version in the following editions (some of which are not yet commercially released):

| Client - Operating System | POET | Server - Operating System |
|---|---|---|
| Windows®NT | Professional | WindowsNT and Windows '95 |
| Windows '95 | Professional | WindowsNT and Windows '95 |
| WindowsNT | Personal | WindowsNT and Windows '95 |
| Windows '95 | Personal | WindowsNT and Windows '95 |

2. Runtime Versions of the above software editions for distribution to third parties, which include POET administrative utilities and POET runtime server versions.

3. Runtime Versions of POET's ODBC Driver Software.

OEM APPLICATIONS:

The OEM Applications include tools for use in, with or for LonWorks networks.





**EXHIBIT B**

LICENSE FEES, ROYALTIES AND SUPPORT CHARGES

1. **LICENSE FEES FOR COPIES OF THE POET DEVELOPMENT KIT VERSION LICENSED BY OEM:**

A. Professional Edition.

| Client - Operating System | Edition | Server - Operating System | Fee |
|---|---|---|---|
| WindowsNT and 95 | Professional Edition | WindowsNT and 95 | $5,000 |

The parties acknowledge OEM's payment in full for one copy of the Professional Edition of the Development Kit Version. Additional copies will be licensed at the per copy fee listed above.

B. Personal Edition (Multi-Tasking Stand Alone edition).

| Client - Operating System | Edition | Server - Operating System | Fee |
|---|---|---|---|
| WindowsNT and 95 | Personal Edition | WindowsNT and 95 | $998 |

2. **ROYALTIES FOR OEM APPLICATIONS DISTRIBUTED BY OEM:**

A. Editions Which May Be Incorporated in OEM Applications and Definitions.

OEM may distribute OEM Applications incorporating the Runtime Versions of the Personal Edition and/or the Professional Edition as provided in this Section 2(A).

As used in this Exhibit B, "OEM's Gross Revenues" shall mean the total revenues received by OEM with respect to distribution of copies of the applicable OEM Application or Upgrade, including royalties or other fees received by OEM from Sublicensees with respect to such distribution, less freight, sales rebates, sales commissions, sales credits, insurance, taxes and other governmental charges or withholding (to the extent included in such revenues), and credits issued by OEM to its customers which were attributable to prior sales or licenses of OEM Applications upon which royalties were paid.

As used in this Exhibit B, "Development Tools" shall mean the OEM Applications comprising the software development tools licensed by OEM to third parties set forth on Exhibit B-1, as such Exhibit may be modified from time to time upon POET's consent. POET agrees not to unreasonably withhold its consent to the addition of software development tools to Exhibit B-1, provided such development tools are reasonably similar in function or purpose to those development tools then listed. "Multi-User Development Tool" shall mean a Development Tool which uses the client/server architecture and standard computer network protocols included in the Professional Edition. "Single-User Development Tool" shall mean a Development Tool which does not implement the client/server





functionality of the Professional Edition or which incorporates the Runtime Version of the Personal Edition.

As used in this Exhibit B, a "Class "B" Machine" shall mean a computer running one or more of the operating systems set forth on Exhibit B-2, or equivalents of the foregoing platforms.

B. Royalties Payable With Respect to OEM's Distribution of Development Tools

i. Single-User Development Tool.

OEM shall pay a per copy royalty of $130 for each copy of a Single-User Development Tool (i) which incorporates Runtime Versions of the Personal Edition or Professional Edition; and (ii) which is licensed for use on a Class "B" Machine, until such time as the first royalty adjustment in accordance with Section 2(E) is effected, at which time OEM's per copy royalty shall be the applicable percentage (determined in accordance with Section 2(E)) of OEM's Gross Revenues received from licensing the copy of any OEM Application incorporated within such Development Tool). In the event OEM elects not to charge a license fee for a Single-User Development Tool and the payment due hereunder is to be calculated based upon OEM's Gross Revenues, the payment shall be based upon OEM's normal and customary Gross Revenues for the affected product. In the event a Single-User Development Tool is bundled for sale or license with other products or applications, the royalty shall be based only upon those Gross Revenues attributable to the Single-User Development Tool.

ii. Multi-User Development Tool.

OEM shall pay a per copy royalty of $350 for each copy of a Multi-User Development Tool (i) which incorporates Runtime Versions of the Professional Edition; and (ii) which is licensed for use on a Class "B" Machine.

C. Royalties Payable With Respect to OEM's Distribution of All Other OEM Applications Incorporating Runtime Versions

i. Personal Edition and Professional Edition. The royalties payable to POET for OEM Applications incorporating Runtime Versions of the Personal Edition or the Professional Edition, exclusive of those set forth in Section 2(B) above, shall be ten percent (10%) of OEM's Gross Revenues received from licensing copies of the OEM Applications. In the event an OEM Application is bundled for sale or license with other products or applications, the royalty shall be based only upon those Gross Revenues attributable to the OEM Application. The foregoing royalties shall be prepaid, as described below. No royalty shall be payable for copies of OEM Applications incorporating Runtime Versions of the Personal Edition or Professional Edition which are used for product development, demonstration or testing purposes, or for internal purposes of OEM where no revenue is received; provided, however, that OEM agrees that it will not distribute OEM Applications without charge, except for evaluation copies, error corrections and the like that are distributed to OEM's licensees.





ii. Prepayments. Upon execution of this Agreement, OEM shall prepay to POET royalties in the amount of $50,000, which amount shall be credited against actual royalties based on Gross Revenues, as described above, that are due and payable to POET until actual royalties reach the amount of such prepayment. When such prepayment is fully expended (i.e., the royalties payable to POET equal the amount of the prepayment), OEM shall deposit with POET another prepayment of $50,000 to be credited against actual royalties subsequently due and payable to POET for Runtime Versions of the Personal Edition and the Professional Edition. Likewise each time a prepayment is expended, so long as this Agreement is in effect, OEM shall deposit an additional prepayment in the amount of $50,000 to be credited against actual royalties due and payable to POET for Runtime Versions of the Personal Edition and the Professional Edition until such time as $1,000,000 has been paid in accordance with this Section 2(C)(ii), after which time no further prepayments shall be due (but royalties shall continue to be due until the license is fully-paid in accordance with the terms of Section 2(E)). OEM shall remit any such prepayment or royalty payment, as applicable, to POET with the next quarterly report that OEM submits after such date, as required under Paragraph 3 below.

D. Licenses of ODBC Driver

OEM shall pay, upon execution of the First Amended and Restated Software OEM License Agreement, a one-time royalty of $20,000 for the fully-paid right and license to distribute an unlimited number of copies of the current version of POET's ODBC Driver software as part of the OEM Applications. The royalty for unlimited distribution rights of each Upgrade to such software, when available and accepted by OEM in accordance with Section 5(B), shall be $7,500, which shall be due and payable upon acceptance of such Upgrade by OEM.

E. Adjustment of Royalty Rate; Fully Paid License

Once total royalties paid under this Agreement for all copies of Runtime Versions of the Licensed Software reach $1,000,000, the royalties and Upgrade fees payable by OEM with respect to Runtime Versions of the Personal Edition and the Professional Edition shall be adjusted as provided in this Section 2(E). Initially, OEM's royalty rate or Upgrade fee as a percentage of Gross Revenues due for copies of Runtime Versions of the Personal Edition and the Professional Edition, including when incorporated in a Single-User Development Tool, shall drop to the corresponding percentage set forth on the chart below. Once cumulative royalties paid by OEM to POET for all copies of Runtime Versions of the Licensed Software reach $9,000,000, no further royalties will be due under this Section 2 with respect to distribution of OEM Applications incorporating any Runtime Version of the Personal Edition or Professional Edition, or Upgrades thereto, and the distribution license for all OEM Applications and Upgrades incorporating the Runtime Versions of the Personal Edition and Professional Edition will become fully paid and unlimited.





| Total Royalty Payments | Royalty Rate as a Percentage of Revenue |
|---|---|
| $1,000,000 | 2% |
| $2,000,000 | 1% |
| $5,000,000 | .5% |
| $9,000,000 | 0% |

3. **REPORTS AND PAYMENT:**

OEM shall keep records of the number of copies of each OEM Application made and distributed by OEM or reported by its Sublicensees, including which edition of the Licensed Software is incorporated within such OEM Application, and any Upgrades distributed in accordance with Section 5(D)(i), (ii) and (iii). On or before the thirtieth day after the end of each calendar quarter during the term of this Agreement, and thereafter until all copies of the OEM Applications that OEM or its Sublicensees have distributed have been accounted for, OEM shall deliver to POET (i) a report detailing the number of copies of the OEM Application made by OEM or its Sublicensees during the previous quarter and identifying which edition of the Licensed Software is incorporated within such copies and (ii) a report of the Gross Revenues received by OEM during such previous quarter on account of distribution of copies of the OEM Application incorporating the Personal Edition or the Professional Edition of the Licensed Software (which shall be separately stated). When submitting such reports, OEM shall pay the applicable royalties for which no prepayment has been made.

4. **AUDIT RIGHTS:**

OEM agrees to maintain, until two (2) years after the transactions to which they pertain, all records required to be kept by OEM pursuant to Section 3. OEM will permit POET's independent auditor, reasonably acceptable to OEM and subject to the execution of OEM's standard form of confidentiality agreement, the right to audit and examine such records during OEM's normal business hours to verify the accuracy of the fees paid hereunder. Such inspections shall not take place more frequently than once each calendar year and shall be made upon reasonable notice. If any such examination discloses a shortfall in payment to POET of more than five percent (5%) for the period audited, OEM agrees to reimburse POET for the reasonable costs assessed by POET's independent auditor for performing such audit.

5. **SUPPORT CHARGES.**

A. <u>Technical Support for Development Kit Version</u>

POET acknowledges that OEM has paid the fees for Technical Support for the period from execution of this Agreement through August 1, 1996. The annual fee for telephonic and electronic support shall be $2,000 per named caller, commencing August 1, 1996. The annual fee for

Maintenance Releases shall be $750 for each copy of the Development Kit Version of the Professional Edition and $150 for each copy of the Development Kit Version of the Personal Edition.

Provided that OEM purchases Maintenance Releases hereunder, no fee shall be assessed upon OEM's distribution of any Runtime Versions of Maintenance Releases.

B. Upgrades Generally

POET will deliver to OEM an evaluation copy of any Upgrade to any Licensed Software licensed hereunder promptly upon its availability. OEM will have 60 days to test and evaluate such Upgrade and determine whether it wishes to license the Upgrade. In the event OEM elects to receive such Upgrade, it may purchase it at POET's then current Upgrade fee, or at such lesser rate as may be agreed, as provided below.

C. Upgrades for Development Kit Version

The Upgrade fee for the Development Kit Version of the Professional Edition is $1,500 per licensed copy. The Upgrade fee as of the date of the first release of an Upgrade to the Development Kit Version of the Personal Edition will be $300 per licensed copy.

D. Upgrades for Runtime Version

OEM may incorporate the Runtime Version of any Upgrade purchased pursuant to Section 5(C) above in any OEM Application distributed after the purchase of such Upgrade, subject to OEM's payment of the applicable royalty with respect to such OEM Application.

OEM will pay an Upgrade fee for the Runtime Versions of the Personal Edition or Professional Edition, for any Upgrade distributed by OEM subsequent to the distribution of an OEM Application (and not as part of the initial distribution of the OEM Application), as follows:

i) OEM will pay ten percent (10%) (or such other rate as is then applicable pursuant to the terms of Section 2(E)) of OEM's Gross Revenues received from distribution of Upgrades to OEM Applications incorporating Runtime Versions of the Personal Edition or Professional Edition which are not Development Tools;

ii) OEM will pay $32.50 per copy for distribution of Upgrades to OEM Applications incorporating Runtime Versions of the Personal Edition or Professional Edition which are Single-User Development Tools where OEM assesses a fee (separate from that charged for maintenance and error correction) for the distribution of such Upgrade; and

iii) OEM will pay $87.50 per copy for distribution of Upgrades to OEM Applications incorporating Runtime Versions of the Professional Edition which are Multi-User Development Tools where OEM assesses a fee (separate from





that charged for maintenance and error correction) for the distribution of such Upgrade.

E. General

The fees for Technical Support and Upgrades shall not be increased during the first two years of this Agreement. Thereafter, such fees shall not increase by more than 10% per annum.

# EXHIBIT C

## POET'S TECHNICAL SUPPORT POLICIES

Telephone and electronic support will be available Monday through Friday, 9:00 AM to 12:00 PM and 1:00 PM to 6:00 PM (Pacific Time).

OEM will report the problem to POET in writing, preferably by e-mail, providing as much information as possible including but not limited to the following:

(a) detailed descriptions of the problem.

(b) results of any tests run by OEM.

(c) test cases, if available.

Upon receipt of the written report of the problem from OEM, POET will respond in accordance with the following schedule:

| Classification | 1st Response | 2nd Response | 3rd Response | Final Response |
|---|---|---|---|---|
| Severity I | 24 hours* | 48 hours* | within 3 days** | next release |
| Severity II | 48 hours* | within 3 days** | within 5 days** | next release |
| Severity III | 3 days** | within 10 days** | within 20 days** | within 2 releases |
| Severity IV | 10 days ** | within 20 days** | within 40 days** | within 2 releases |
| All others | 10 days | na | na | na |

* Only if received on a business day (Monday through Friday) between 9:00 AM and 5:00 PM, Pacific Time. Otherwise, time commences on the following business day.

** Business Days (Monday through Friday).

Classification of problems will be assigned by OEM and confirmed by POET. POET may reclassify the problem based on POET's technical analysis. In the event that POET and OEM disagree on the priority of a specific problem, both parties will use commercially reasonable efforts to resolve the disagreement in a fair fashion. POET will not change the priority of a problem that OEM reasonably designated as "Severity I Level." OEM will act in good faith to manage the prioritization process so that "Severity I Level" designations are used in an appropriate manner.

The response schedule is defined as follows:

(a) **First Response** means that POET will provide written acknowledgment of the problem to OEM within the time specified above.

(b) **Second Response** means that POET will analyze the problem and use commercially reasonable efforts to determine the cause of the problem within the time specified above.





(c) **Third Response** means that POET will use commercially reasonable efforts to provide a resolution to the problem within the time specified above.

(d) **Final Response** means that POET will incorporate the resolution to the problem in a Maintenance Release according to the release schedule shown above. Generally a Final Response shall occur no sooner than the corresponding Third Response. POET will, however, use commercially reasonable efforts to accommodate OEM's release schedule even if that schedule may require response times that are sooner than those outlined in the above table.

POET will provide monthly written reports on the status of problems reported by OEM.

**"Error Severity Level"** shall mean classifications of Errors according to the following definitions:

(a) **"Severity I Error Level"** shall mean a problem in critical functionality without a work around; an emergency condition that causes the end user to be unable to use the program and that has a critical impact on such end user's operations. This condition requires an immediate solution.

(b) **"Severity II Error Level"** shall mean a problem in critical functionality with a work around; that is, a condition which severely restricts the end user's operations but such end user can continue to use the program although it makes the performance of any one or more functions difficult. This problem cannot be readily circumvented or avoided on a temporary basis by the end user and requires a rapid solution.

(c) **"Severity III Error Level"** shall mean a problem in non-critical functionality without a work around; that is, a limited condition that cannot be readily circumvented or avoided on a temporary basis by the end user.

(d) **"Severity IV Error Level"** shall mean a problem in non-critical functionality with a work around; that is, a minor condition that can be readily circumvented or avoided on a temporary basis by the end user.

(e) **"Request for Enhancement"** shall mean any request presenting a condition with lesser severity than Severity IV.





# EXHIBIT D

## ESCROW AGREEMENT

**The escrow agreement is attached and will be modified by SourceFile and POET as follows:**

Section 4, part (i) of the agreement will be modified by adding the following at the end thereof:

The notice from Beneficiary must be in the form of a certificate signed by an officer of Beneficiary certifying that a Release Condition in the license agreement between Depositor and Beneficiary has occurred.

Section 4, parts (iii) and (iv) will be deleted and replaced with the following:

(iii) SourceFile shall deliver a copy of the Source Material to Beneficiary promptly after receipt of the officer's certificate described in Section 4, part (i) above and does not need to wait to see if Depositor shall deliver a written notice to SourceFile stating the Release Condition has not occurred or has been cured. Depositor and Beneficiary hereby acknowledge that if Depositor believes that the Release Condition has not occurred or has been cured, neither Depositor nor Beneficiary shall hold SourceFile liable for wrongful release of the Source Material, if the conditions for release stated in Section 4, part (i) above have been met, and further acknowledge that Depositor and Beneficiary have created, in the aforementioned license agreement, a mechanism for settling any such dispute between them by arbitration after the fact of release of the Source Material.

I:\PUBLIC\MUB\0180638.09



**ECHELON CORPORATION**
**POET SOFTWARE CORPORATION**

**AMENDMENT TO**
**FIRST AMENDED AND RESTATED SOFTWARE OEM LICENSE AGREEMENT**

This Amendment (the "Amendment") to the First Amended and Restated Software OEM License Agreement, entered into as of December 11, 1995, (the "Agreement") is entered into as of October 1, 1999 (the "Effective Date") by and between Echelon Corporation ("OEM") and POET Software Corporation ("POET").

Whereas, POET and OEM entered into a Software OEM License Agreement, executed on December 11, 1995, (the "Prior Agreement") and whereas the Prior Agreement was superseded by the Agreement, now, the parties agree that the Agreement is hereby amended as follows:

1. **Runtime Version Royalty Prepayment.** On or before December 31, 1999, OEM shall pay to POET a nonrefundable royalty prepayment of two hundred thousand dollars ($200,000) (the "Special Prepayment"). After the Special Prepayment is made, POET agrees that OEM shall then have a net prepayment balance of royalties under this Agreement of two hundred nineteen thousand eight hundred thirty four dollars ($219,834). Actual royalties shall be credited against such net prepayment as set forth in Section 2.C(ii) of Exhibit B to the Agreement. OEM shall not owe any additional prepayments to POET until the net prepayment under the Agreement, including, without limitation, the Special Prepayment, has been fully expended.

2. **Change to Royalty Rate from Runtime Versions.** Exhibit B, Section 2.C(i), of the Agreement is hereby modified so that the royalty payable to POET for distribution of OEM Applications shall be 7.5%, instead of 10% effective as of October 1, 1999.

3. **Change to Adjustment of Royalty Rate; Fully Paid License.** The third sentence of Exhibit B, Section 2.E, of the Agreement is hereby modified so that the cumulative royalty threshhold is $8,500,000, instead of $9,000,000. The chart at the end of this Section is hereby deleted in its entirety and is hereby replaced with the following:

**Graduated Runtime Version Royalty Schedule**

| Total Royalty Payments From | To | Royalty Rate as a Percentage of Revenue |
|---|---|---|
| $0 | $61,783 | 10.0% |
| $61,784 | $1,000,000 | 7.5% |
| $1,000,001 | $2,000,000 | 1.5% |
| $2,000,001 | $5,000,000 | 0.75% |
| $5,000,001 | $8,500,000 | 0.375% |
| $8,500,001 | Unlimited | 0% |

4. **Relationship to Agreement.** All capitalized terms used herein but not defined herein have the meaning for such term provided in the Agreement. This Amendment shall be governed by and subject in all respects to the terms of the Agreement; however, in the event of any conflict between the Agreement and this Amendment, the terms of this Amendment shall control.

5. **Entire Agreement.** The Agreement and this Amendment set forth the entire Agreement and understanding between the parties as to the subject matter of such documents and merges all prior discussions. Without limiting the foregoing, all correspondence prepared or exchanged in anticipation of this Amendment is expressly superseded. Except as specified in this Amendment, the Agreement remains in full force and effect.

In Witness whereof, the parties hereto have duly executed this Amendment.

| POET SOFTWARE CORPORATION | ECHELON CORPORATION |
|---|---|
| By: [signature] | By: [signature] |
| Name: Terry Wong | Name: Oliver R. Stanfield |
| Title: VP Finance | Title: VP & CFO |
| Date: 12/30/99 | Date: 12/30/99 |

**ECHELON CORPORATION**
**POET SOFTWARE CORPORATION**

**AMENDMENT NO. 2 TO THE**
**FIRST AMENDED AND RESTATED SOFTWARE OEM LICENSE AGREEMENT**
**AND TO THE**
**AMENDMENT NO. 1 TO THE FIRST AMENDED AND RESTATED SOFTWARE OEM LICENSE AGREEMENT**

This Amendment No. 2 to the First Amended and Restated Software OEM License Agreement ("Amendment No. 2") is entered into as of April 1, 2001 (the "Effective Date") by and between Echelon Corporation ("OEM") and POET Software Corporation ("POET").

Whereas, POET and OEM entered into a Software OEM License Agreement (the "Prior Agreement") executed on December 11, 1995, a First Amended and Restated Software OEM License Agreement (the Agreement") effective on December 11, 1995 that superceded the Prior Agreement, and an Amendment No. 1 to the First Amended and Restated Software OEM License Agreement ("Amendment No. 1") executed on October 1, 1999, now the parties agree as follows:

1. **Runtime Version Royalty Prepayment.** On or before June 29, 2001, OEM shall pay to POET a nonrefundable royalty prepayment of two hundred fifty thousand dollars ($250,000) (the "Special Prepayment"). After the Special Prepayment is made, POET agrees that OEM shall then have a net prepayment balance of royalties under this Agreement of two hundred eighty five thousand five hundred thirty three dollars ($285,533). Actual royalties shall be credited against such net prepayment as set forth in Section 2.C.(ii) of Exhibit B to the Agreement. OEM shall not owe any additional prepayments to POET until the net prepayment under the Agreement, including, without limitation, the Special Prepayment, has been fully expended.

2. **Change to Royalty Rate from Runtime Versions.** Exhibit B, Section 2.C (i), of the Agreement is hereby modified so that the royalty payable to POET for distribution of OEM Applications shall be 5% instead of 7.5%, effective as of April 1, 2001.

3. **Change to Adjustment of Royalty Rate; Fully Paid License.** The third sentence of Exhibit B, Section 2.E, of the Agreement is hereby modified so that the cumulative royalty threshold is $8,250,000 instead of $8,500,000. The chart at the end of this Section is hereby deleted in its entirety and is hereby replaced with the following:

**Graduated Runtime Version Royalty Schedule**

| Total Royalty Payments | | Royalty Rate as a |
|---|---|---|
| **From** | **To** | **Percentage of Revenue** |
| $0 | $61,783 | 10.0% |
| $61,784 | $206,698 | 7.5% |
| $206,699 | $1,000,000 | 5.0 |
| $1,000,001 | $2,000,000 | 1.0% |
| $2,000,001 | $5,000,000 | 0.5% |
| $5,000,001 | $8,250,000 | 0.25% |
| $8,250,001 | Unlimited | 0% |

4. **Relationship to Agreement.** All capitalized terms used herein but not defined herein have the meaning for such term provided in the Agreement. This Amendment No. 2 shall be governed by and subject in all respects to the terms of the Agreement; however, in the event of any conflict between the Agreement or Amendment No. 1, and this Amendment No. 2, the terms of this Amendment No. 2 shall control.

5. **Entire Agreement.** The Agreement, Amendment No. 1 and this Amendment No. 2 set forth the entire agreement and understanding between the parties as to the subject matter of such documents and merges all prior discussions. Without limiting the foregoing, all correspondence prepared or exchanged in anticipation of this Amendment No. 2 is expressly superseded. Except as specified in this Amendment No. 2, the Agreement and Amendment No. 1 remain in full force and effect.

In Witness whereof, the parties hereto have duly executed this Amendment.

| **POET SOFTWARE CORPORATION** | **ECHELON CORPORATION** |
|---|---|
| By: [signature] | By: [signature] |
| Name: Jerry Wohl | Name: OLIVER R. STANFIELD |
| Title: VP Finance | Title: VP & CFO |
| Date: 6/28/01 | Date: 6/28/01 |

**ECHELON CORPORATION**
**FASTOBJECTS, INC.**

**AMENDMENT NO. 3 TO THE**
**FIRST AMENDED AND RESTATED SOFTWARE OEM LICENSE AGREEMENT**
**AND TO**
**AMENDMENTS NO. 1 AND NO. 2 TO THE**
**FIRST AMENDED AND RESTATED SOFTWARE OEM LICENSE AGREEMENT**

This Amendment No. 3 to the First Amended and Restated Software OEM License Agreement ("Amendment No. 3") is entered into as of January 1, 2004 (the "Effective Date") by and between Echelon Corporation ("OEM") and FastObjects, Inc. ("FastObjects").

Whereas, FastObjects (previously known as Poet Software Corporation) and OEM entered into a Software OEM License Agreement (the "Prior Agreement") executed on December 11, 1995, a First Amended and Restated Software OEM License Agreement ("the Agreement") effective on December 11, 1995 that superceded the Prior Agreement, an Amendment No. 1 to the First Amended and Restated Software OEM License Agreement ("Amendment No. 1") effective on October 1, 1999, and an Amendment No. 2 to the First Amended and Restated Software OEM License Agreement ("Amendment No. 2") effective on April 1, 2001, now the parties agree as follows:

1. **Runtime Version Royalty Prepayment.** On or before March 5, 2004, OEM shall pay to FastObjects a nonrefundable royalty prepayment of one hundred fifty thousand dollars ($150,000) (the "Special Prepayment"). After the Special Prepayment is made, FastObjects agrees that OEM shall then have a net prepayment balance of royalties under this Agreement of two hundred ten thousand six hundred fifty seven dollars ($210,657). Actual royalties shall be credited against such net prepayment as set forth in Section 2.C.(ii) of Exhibit B to the Agreement. OEM shall not owe any additional royalty payments to FastObjects until the net prepayment under the Agreement, including, without limitation, the Special Prepayment, has been reduced to zero as a result of crediting royalties due.

2. **Change to the Royalty Rate from Runtime Versions.** Exhibit B, Section 2.C (i), of the Agreement is hereby modified so that the royalty payable to FastObjects for distribution of OEM Applications shall be 2.5% instead of 5%, effective as of January 1, 2004.

3. **Change to the Graduated Runtime Version Royalty Schedule.** The chart at the end of Exhibit B, Section 2.E, of the Agreement is hereby deleted in its entirety and is hereby replaced with the following:

**Graduated Runtime Version Royalty Schedule**

| Total Royalty Payments | | Royalty Rate as a |
|---|---|---|
| From | To | Percentage of Revenue |
| $0 | $61,783 | 10.0% |
| $61,784 | $206,698 | 7.5% |
| $206,699 | $639,344 | 5.0% |
| $639,345 | $1,000,000 | 2.5% |
| $1,000,001 | $2,000,000 | 1.0% |
| $2,000,001 | $5,000,000 | 0.5% |
| $5,000,001 | $8,250,000 | 0.25% |
| $8,250,001 | Unlimited | 0% |

4. **Relationship to Agreement.** All capitalized terms used herein but not defined herein have the meaning for such term provided in the Agreement. This Amendment No. 3 shall be governed by and subject in all respects to the terms of the Agreement; however, in the event of any conflict between the Agreement, Amendment No. 1 or Amendment No. 2, and this Amendment No. 3, the terms of this Amendment No. 3 shall control.

5. **Entire Agreement.** The Agreement, Amendment No. 1, Amendment No. 2 and this Amendment No. 3 set forth the entire agreement and understanding between the parties as to the subject matter of such documents and merges all prior discussions. Without limiting the foregoing, all correspondence prepared or exchanged in anticipation of this Amendment No. 3 is expressly superseded. Except as specified in this Amendment No. 3, the Agreement, Amendment No. 1 and Amendment No. 2 remain in full force and effect.

In Witness whereof, the parties hereto have duly executed this Amendment.

**FASTOBJECTS, INC.**

By: [signature]

Name: David Guinther

Title: President + CEO

**ECHELON CORPORATION**

By: [signature]

Name: OLIVER R. STANFIELD

Title: EXECUTIVE VP & CFO

# AMENDMENT NO. 4

This Amendment No. 4 (this "**Amendment**") to the First Amended and Restated Software OEM License Agreement with an effective date of December 11, 1995 between Echelon Corporation ("**OEM**") and Actian Corporation (by assignment from its wholly owned subsidiary, Versant Software, LLC, formerly Poet Software Corporation, "**Actian**"), as amended, (the "**Agreement**") is into entered between OEM and Actian effective as of the date the last party signs below (the "**Amendment Effective Date**"). Unless otherwise defined in this Amendment, all capitalized terms used in this Amendment will have the meanings assigned to them in the Agreement.

1. **Amendments**.

a. Restate Exhibit B, Section 2(E) in its entirety as follows:

Once total royalties paid under this Agreement for all copies of Runtime Version of the Licensed Software reach $1,000,000, the royalties payable by OEM with respect to Runtime Versions of the Personal Edition and the Professional Edition shall be adjusted as provided in this Section 2(E). Initially, OEM's royalty rate as a percentage of Gross Revenues due for copies of Runtime versions of the Personal Edition and the Professional Edition, including when incorporated in a Single-User Development Tool, shall drop to the corresponding percentage set forth on the chart below. Once cumulative royalties paid by OEM to Actian for all copies Runtime Versions of the Licensed Software reach $8,250,000, no further royalties will be due under this Section 2 with respect to distribution of OEM Applications incorporating any Runtime Version of the Personal Edition or Professional Edition, and the distribution license for all OEM Applications incorporating the Runtime Versions of the Personal Edition and Professional Edition will become fully paid and unlimited.

**Graduated Runtime Version Royalty Schedule**

| **Total Royalty Payments** From | To | **Royalty Rate as a Percentage of Revenue** |
|---|---|---|
| $0 | $61,783 | 10.0% |
| $61,784 | $206,698 | 7.5% |
| $206,699 | $639,344 | 5.% |
| $639,345 | $1,000,000 | 2.5% |
| $1,000,001 | $2,000,000 | 1% |
| $2,000,001 | $5,000,000 | 0.5% |
| $5,000,001 | $8,250,000 | 0.25% |
| $8,250,001 | Unlimited | 0% |

b. Restate Exhibit B, Section 5(D)(i) in its entirety as follows:

"OEM will pay fifteen percent (15%) of OEM's Gross Revenues received from distribution of Upgrades to OEM Applications incorporating Runtime Versions of the Personal Edition or Professional Edition which are not Development Tools made on or after April 1, 2017."

2. **Entire Agreement; Conflict.** Except as amended by this Amendment, the Agreement will remain in full force and effect. This Amendment, together with the Agreement, constitute the complete and final agreement of the parties on the subject matter hereof and supersede the parties' prior agreements, understandings and discussions relating to such subject matter. No modification of the Agreement is binding unless it is in writing and signed by the parties hereto.

3. **Counterparts.** This Amendment may be executed in counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

IN WITNESS WHEREOF, the parties have executed this Amendment No. 4 as of the Amendment Effective Date.

**ECHELON CORPORATION**

By: [signature]

Name: C. MICHAEL MARSZEWSKI

Title: VP & CFO

Date signed: 6/23/17




**ACTIAN CORPORATION**

By: DocuSigned by: Greg J. Cannon 90BB02A3979A44F...

Name: Greg J. Cannon

Title: Financial Controller

Date signed: 6/26/2017 | 22:39 PDT

ACTIAN LEGAL APPROVED

Date 6/26/2017 | 20:04 PDT

Initials: LH