UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ACTIAN CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>ENOCEAN INC., et al.,<br><br>Defendants. | Case No. 24-cv-01470-EKL<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 88, 89, 90 |

Before the Court are cross-motions for summary judgment on the same issue: Whether Defendants obtained a valid license to use Plaintiff's copyrighted software. *See* Actian Mot. for Summ. J., ECF No. 89 ("Actian MSJ"); EnOcean Cross-Mot. for Summ. J., ECF No. 90 ("EnOcean MSJ"). After reviewing the briefs, the statements of undisputed facts, and the complete evidentiary record submitted by the parties, the Court provided the parties with a tentative ruling and heard argument on September 17, 2025. For the following reasons, Defendants' motion is GRANTED and Plaintiff's motion is DENIED.

**I.    BACKGROUND**

    **A.    Procedural History**

Plaintiff Actian Corp. ("Actian") asserts two claims against Defendants EnOcean Inc., EnOcean USA Inc., EnOcean Edge Inc., and EnOcean GmBH (together, "EnOcean"). Second Am. Compl. at 1, ECF No. 69 ("Compl."). First, Actian claims that EnOcean infringed its copyrights by reproducing and distributing Actian's software without a valid license. *Id*. ¶¶ 70-81. Second, and in the alternative, if EnOcean had a valid license, EnOcean breached the license agreement by failing to comply with certain royalty-reporting and other terms. *Id*. ¶¶ 82-90. EnOcean claims that it has a valid license, which it received by assignment from Actian's former

licensee in an asset purchase agreement.  It is undisputed that EnOcean does not possess any other form of license – whether oral, implied, or by estoppel – to use, reproduce, or distribute copies of Actian's software.[1]  Fact Nos. 79-81.  Recognizing that the validity of EnOcean's express license is "a central issue in this case," the parties jointly requested permission to "file early cross-motions for summary judgment" on this issue.   Joint Case Mgmt. Statement at 1-2, ECF No. 81.  The Court permitted the cross-motions, *see* ECF No. 84, which are now fully briefed.

### B.     Undisputed Facts

The present business dispute derives from a software licensing agreement executed by POET Software Corporation ("Poet") and Echelon Corporation ("Echelon") nearly three decades ago.  At the time, Echelon was a pioneering technology company that made some of the first products that would later be known as the "Internet of Things" or "IoT," which helped launch a new industry of low-cost smart devices that communicated with each other.  Add. Fact No. 29.  In the mid-1990s, Echelon identified an object database then known as POET and later known as FastObjects ("Actian Software" or "FastObjects Software") that was capable of supporting Echelon's soon to be released software product.  Add. Fact No. 30; *see also* Blomseth Dep Tr. 56:7-58:17, ECF No. 88-24 (elaborating on Echelon's reasons for selecting the FastObjects Software).  The FastObjects Software is protected by several copyright registrations.  Fact No. 4.

On December 11, 1995, Poet and Echelon entered into a First Amended and Restated Software OEM License Agreement ("OEM Agreement").[2]  Fact No. 1.  The OEM Agreement granted Echelon a license to Poet's proprietary FastObjects Software.  Fact Nos. 2, 3.  Under the OEM Agreement, Poet authorized Echelon to create, reproduce, and distribute "OEM Applications" that incorporate or bundle the FastObjects Software.  Fact No. 5.  Through a series of transactions, Actian became Poet's successor in interest under the OEM Agreement.  Fact

---

[1] The facts cited in this Order are undisputed for purposes of the cross-motions.  *See* Combined Separate Statement, ECF No. 92-1.  Citations to "Fact No." reference the undisputed facts proffered by Actian, and citations to "Add. Fact No." reference the undisputed facts proffered by EnOcean.  To the extent a party objects to evidence, but concedes that the facts are undisputed, the evidentiary objections are not material to the Court's analysis.

[2] The OEM Agreement was amended four times, Fact Nos. 8-10, 15, but the amendments are not material to the issues raised here.

No. 13.  Through a separate series of transactions, various Dialog Semiconductor and Renesas entities (together, "Renesas") became Echelon's successor in interest under the OEM Agreement.[3] *See* Fact Nos. 19-22, 77.  Section 12.2 of the OEM Agreement sets forth the conditions under which the OEM Agreement may be assigned.  OEM Agreement § 12.2, ECF No. 88-4.  These conditions are discussed in greater detail below.

By 2022, the portion of the business that included products manufactured under the OEM Agreement had become an increasingly small and incompatible unit of Renesas's operations, as Renesas is primarily a semiconductor manufacturing company.  Add. Fact No. 33.  Therefore, Renesas began looking to sell this business unit to a more strategically aligned company so that it could focus on its core semiconductor business.  *Id.*  EnOcean was approached about buying this business unit, Add. Fact No. 5, and the parties exchanged term sheets, Add. Fact Nos. 6-8.

On September 18, 2022, Renesas and EnOcean entered into an Asset Purchase Agreement ("APA").  Fact No. 23; *see also* Defs.' Ex. 15, ECF No. 90-21.  It is undisputed that the APA involved the sale of assets, not a merger or acquisition between the two companies.  Fact No. 25.  The APA transferred to EnOcean a specific list of "Purchased Assets" which relate to a list of products referred to as the "Business Products."  Fact Nos. 25, 31.  The Business Products include products that make use of Actian's FastObjects Software, as well as other products that do *not* use the software and thus are not covered by the OEM Agreement.  Fact No. 26; Add. Fact No. 3.

The APA transferred to EnOcean several categories of assets.  First, EnOcean acquired all "inventory, including inventories of raw materials, work in process, finished goods, parts and components exclusively related to the Business Products."  Fact No. 32.  Second, EnOcean acquired "all rights and benefits under the Assumed Contracts set forth on Schedule 2.1(d)," which includes the OEM Agreement.  Fact Nos. 33-34.  Third, EnOcean acquired "the Intellectual Property set forth on Schedule 2.1(g) (the 'Purchased IP')."  Fact No. 35.  The Purchased IP includes:  hardware assets; design files, which describe how a product is designed; manufacturing

---

[3] The corporate distinctions between the various Dialog and Renesas entities are not material here.  It is undisputed that Dialog Semiconductor Plc was acquired by Renesas Electronics Corporation, and Dialog Semiconductor US Inc. is now known as Renesas Design US Inc.  Fact Nos. 22, 77.

files, which describe how a product is manufactured; and source code utilized in the relevant products. Fact Nos. 36-40; *see also* APA § 2.1(g) & Schedule 2.1(g).

Renesas and EnOcean also executed an Intellectual Property Matters Agreement ("IPMA") ancillary to the APA. Fact No. 45. The IPMA provides that certain intellectual property would be deemed "Seller Retained IP." The Seller Retained IP includes "all Copyrights, Trade Secrets, and Patents . . . that, in the absence of a license thereto, would be infringed by the Business Products" that were transferred to EnOcean. Fact No. 46. Although Renesas kept title to this intellectual property, it granted EnOcean a "non-exclusive, worldwide, royalty-free, fully paid-up, non-transferable, . . . irrevocable, perpetual and non-sublicensable license under the Seller Retained IP, solely as necessary to conduct the Business."[4] Fact No. 47. The IPMA expressly notes that this transfer is a license – not a sale – of the Seller Retained IP. Fact No. 48. EnOcean granted Renesas a similar license to use intellectual property contained in the Purchased IP so that Renesas could continue to engage in aspects of its business that were not transferred under the APA. Fact No. 50. Renesas also licensed certain trademarks to EnOcean under a Transitional Trademark License Agreement ("TTLA"). Fact Nos. 51-53.

The APA closed on September 30, 2022, and EnOcean began operating the Business with the assets and licenses it received from Renesas on October 1, 2022. Add. Fact No. 14. After September 30, 2022, Renesas instructed customers of the Business to contact support at EnOcean for any issues related to the Business Products. Add. Fact No. 21. On October 2, 2022, Actian received notice that the rights under the OEM Agreement had been transferred to EnOcean. Fact No. 72. Additional facts are discussed below where relevant to the Court's analysis.

## II.   LEGAL STANDARD

### A.   Summary Judgment

A court may grant summary judgment on any issue if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A

---

[4] Actian has not produced evidence showing that Renesas retained any specific copyrights, trade secrets, or patents that relate to products containing the Actian Software. This issue is discussed below. *See infra* Section III.A.

1  fact is material if, under the governing substantive law, it could affect the outcome of the case.
2  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence
3  is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

4  The moving party bears the initial burden of demonstrating that there is no genuine dispute
5  of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party may
6  satisfy this burden in different ways depending on whether it has the burden of proof at trial.  If
7  the moving party bears the burden of proof at trial, it must cite to "particular parts of materials in
8  the record" to demonstrate that no reasonable trier of fact could find for the non-moving party.
9  Fed. R. Civ. P. 56(c)(1)(A).  By contrast, if the non-moving party bears the burden of proof at
10 trial, the moving party need only demonstrate that there is an absence of evidence to support the
11 non-moving party's case.  *Celotex*, 477 U.S. at 325; *see also* Fed. R. Civ. P. 56(c)(1)(B).

12 Once the moving party has met its burden, the burden shifts to the non-moving party to
13 designate specific facts showing that there is a genuine dispute.  *Celotex*, 477 U.S. at 324.
14 To carry this burden, the non-moving party must "do more than simply show that there is some
15 metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
16 475 U.S. 574, 586 (1986).  "The mere existence of a scintilla of evidence in support of the [non-
17 movant's] position will be insufficient" to survive summary judgment.  *Anderson*, 477 U.S. at 252.
18 Instead, "there must be evidence on which the jury could reasonably find for the [non-moving
19 party]." *Id.*

20 In determining whether there is a genuine dispute of material fact, the court must take "the
21 evidence and all reasonable inferences drawn therefrom in the light most favorable to the non-
22 moving party." *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011).  The court does
23 not "engage in credibility determinations or weigh evidence." *Munden v. Stewart Tit. Guar. Co.*,
24 8 F.4th 1040, 1044 (9th Cir. 2021).  "[W]hen simultaneous cross-motions for summary judgment
25 on the same claim are before the court, the court must consider the appropriate evidentiary
26 material identified and submitted in support of both motions, and in opposition to both motions,
27 before ruling on each of them." *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249
28 F.3d 1132, 1134 (9th Cir. 2001).

At summary judgment, the focus is not "on the admissibility of the evidence's form," but rather "on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003). "To survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rule of Civil Procedure 56." *Block v. City of Los Angeles*, 253 F.3d 410, 418-19 (9th Cir. 2001). An affidavit or declaration "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

### B. Contract Interpretation

The cross-motions turn on issues of contract interpretation that are suitable for summary judgment. *See Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 990 (9th Cir. 2006). It is undisputed that the OEM Agreement is governed by California law. Fact No. 16; *see also* OEM Agreement § 12.1. Under California law, a contract "must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." Cal. Civ. Code § 1636. "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." *Id.* § 1638. "The words of a contract are to be understood in their ordinary and popular sense[.]" *Id.* § 1644; *see also Santisas v. Goodin*, 17 Cal. 4th 599, 608 (1998) (holding that a term's "ordinary and popular" meaning controls, unless the parties used a technical or special meaning).

"When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible." Cal. Civ. Code § 1639. "Pursuant to the parol evidence rule, extrinsic evidence cannot be used to contradict or supplement an agreement if it is intended to be a final expression of that agreement and a complete and exclusive statement of the terms." *Lonely Maiden Prods., LLC v. GoldenTree Asset Mgmt., LP*, 201 Cal. App. 4th 368, 376 (2011). "Generally, finality may be determined from the writing itself. If on its face the writing purports to be a complete and final expression of the agreement, parol evidence is excluded." *Pollyanna Homes, Inc. v. Berney*, 56 Cal. 2d 676, 679-80 (1961). Here, it is undisputed that the OEM Agreement contains an integration clause. Fact No. 18. That clause provides that the OEM

6

Agreement and its amendments "constitute the complete and final agreement of the parties . . . and supersede the parties' prior agreements, understandings and discussions relating to such subject matter. No modification of the Agreement is binding unless it is in writing and signed by the parties hereto." OEM Agreement § 12.10 & Amend. 4. Thus, the Court does not consider parol evidence.

**III.    DISCUSSION**

The sole issue before the Court is whether EnOcean obtained a valid license to use the Actian Software by assignment under the APA. EnOcean bears the burden of proof on this issue. *Cockerell v. Title Ins. & Trust Co.*, 42 Cal. 2d 284, 292 (1954) ("The burden of proving an assignment falls upon the party asserting rights thereunder."); *cf. Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110, 1114 (9th Cir. 2000) ("The existence of a license creates an affirmative defense to a claim of copyright infringement."). Therefore, the Court may grant summary judgment for EnOcean as to the validity of the license only if the undisputed facts show that no reasonable trier of fact could find in Actian's favor that the license is invalid. By contrast, if the undisputed facts show that no reasonable trier of fact could find in EnOcean's favor, the Court may grant summary judgment for Actian. If there is a genuine dispute of material fact regarding the validity of EnOcean's purported license, both motions must be denied.

Here, there is no dispute that EnOcean entered into the APA with Renesas. Instead, the parties disagree as to whether the APA effected a valid assignment of the rights under the OEM Agreement. Section 12.2 of the OEM Agreement sets forth the conditions under which rights under the OEM Agreement may be assigned:

> Except in the event of a sale of substantially all of its assets to which this Agreement relates or in the event of a merger or acquisition and provided the assignee agrees in writing to be bound by all the terms and conditions of this Agreement, OEM may not assign or delegate this Agreement or any of its licenses, rights or duties under this Agreement, directly or indirectly, by operation of law or otherwise, without the prior written consent of POET, which shall not unreasonably be withheld. Any such attempted assignment or delegation shall be void. Except as provided above, this Agreement shall inure to the benefit of each party's successors and assigns.

7

1    Actian argues that the assignment to EnOcean of the rights under the OEM Agreement was invalid
2    for two reasons. First, Actian argues that the APA was not a "sale of substantially all of
3    [Renesas's] assets to which [the OEM] Agreement relates." Second, Actian argues that EnOcean
4    did not "agree[] in writing to be bound by all the terms and conditions of [the OEM] Agreement."
5    The Court addresses these issues in turn.

        **A.     EnOcean Obtained Substantially All Assets**

It is undisputed that the OEM Agreement may be assigned without Actian's prior written consent only "in the event of a sale of substantially all of [the OEM's] assets to which [the OEM] Agreement relates or in the event of a merger or acquisition." OEM Agreement § 12.2. It is also undisputed that the APA does not qualify as a merger or acquisition because it involved only the sale of certain assets previously owned by Renesas. Fact No. 24. Thus, the critical question is whether Renesas, through the APA, sold to EnOcean "substantially all of its assets to which [the OEM] Agreement relates." The Court concludes that there is no genuine dispute of material fact that this condition was met.

The Court begins by construing the term "substantially all" within the meaning of the OEM Agreement. By its ordinary meaning, "substantially" means "material," "important," or "essential" – but it is a relative term, and its measure depends on the circumstances. *Atchison, Topeka & Santa Fe Ry. Co. v. Kings Cnty. Water Dist.*, 47 Cal. 2d 140, 144 (1956). In the context of the OEM Agreement, "substantially all" necessarily encompasses less than "all," otherwise the qualifying word "substantially" would be surplusage – which should be avoided when interpreting a contract. *See* Cal. Civ. Code § 1641. In the context of a company's sale of assets, courts have construed the term "substantially all" by considering the importance of the assets to the business, and whether the company could continue its business after the sale of such assets. *See, e.g.*, *Jeppi v. Brockman Holding Co.*, 34 Cal. 2d 11, 15 (1949). When less than all assets are sold, courts have considered the nature of the retained assets and "the purpose behind their retention." *Moffatt v. Comm'r*, 363 F.2d 262, 268 (9th Cir. 1966).[5]

---

[5] The parties rely on similar authority, and generally agree on these principles, but disagree regarding the application of these principles here. *See* Actian MSJ at 8-10; EnOcean MSJ at 8-13.

8

One further distinction is important here. The relevant term of the OEM Agreement requires a sale of substantially all assets *to which the OEM Agreement relates* – it does not require a sale of substantially all assets of *the company*. This distinction matters because Renesas is a large semiconductor company with many assets unrelated to the OEM Agreement. *See* Add. Fact No. 33. The APA encompassed a sale of an entire business unit – not just products that use the Actian Software. Fact No. 26; Add. Fact No. 3. Thus, to the extent Renesas retained some assets unrelated to the products covered by the OEM Agreement, it would not be relevant to the Court's analysis.

Applying these principles here, the Court finds no genuine dispute of fact that the APA effected a sale of "substantially all" of Renesas's assets to which the OEM Agreement relates. Most important, EnOcean purchased "all rights and benefits under the Assumed Contracts" – which includes the OEM Agreement. APA § 2.1(d). EnOcean also purchased "all right, title and interest" in (a) "all inventory"; (b) "all deposits, advances, pre-paid expenses and credits"; (c) "all furniture, fixtures, machinery, equipment, computer hardware, and other tangible assets and personal property"; and (d) the Purchased IP, which includes hardware assets, design files, manufacturing files, and the source code utilized in the relevant products. *Id*. § 2.1; Fact Nos. 32-40. In the APA, Renesas represented that these assets "constitute all assets necessary for the operation of the Business in the ordinary course immediately after the Closing . . . in substantially the same manner as conducted by [Renesas] as of immediately prior to the Closing in all material respects." APA § 4.4(d); Fact No. 56; *see also* Wijgergangs Decl. ¶¶ 10-11, ECF No. 90-19. Based on these undisputed facts, EnOcean obtained substantially all of the assets to which the OEM Agreement relates because it obtained all assets necessary to continue producing, selling, and distributing the products covered by the OEM Agreement.

Actian argues that this assignment was invalid because Renesas retained the ability to continue selling products that contain Actian Software. Actian points to screenshots of Renesas's website, which show two products that allegedly include the Actian Software. These screenshots are not evidence that Renesas has continued to sell products that incorporate Actian Software after

9

the APA closing date,[6] much less that Renesas retained assets relating to the OEM Agreement. Phillip Graves, a senior director of product marketing at Renesas, submitted a declaration stating that, after the APA closing date, Renesas no longer "had the ability to operate any portion of [this] product line or to manufacture any [such] products." Graves Decl. ¶ 2, ECF No. 90-2. Graves further states that, upon learning of the website product pages, "Renesas began the process of removing the [product that incorporates Actian Software] from the Renesas website as the [product] is not available for purchase." *Id.* ¶ 3; Add. Fact No. 23. Thus, there is no genuine dispute of fact that Renesas transferred its rights and ability to make products that include the Actian Software to EnOcean. Nor is there any genuine dispute that Renesas no longer operates that portion of the business, which was fully transferred to EnOcean.

Actian also argues that Renesas retained certain intellectual property rights. It is true that Renesas fully licensed – but did not sell – certain intellectual property rights (the Retained IP) to EnOcean. IPMA at ENOCEAN001790, ECF No. 90-21. But, to be clear, the Retained IP is Renesas's intellectual property – it is *not* intellectual property in the Actian Software. And this intellectual property was retained by Renesas for use in products that *do not* include the Actian Software, and which were *not* sold as part of the APA.[7] Indeed, Actian has not identified any specific copyrights, trade secrets, or patents retained by Renesas that actually relate to products containing the Actian Software.[8]

---

[6] In fact, one of the two products in the screenshots – the FT 6050 – does not and "could not possibly run the Actian [S]oftware." Blomseth Decl. ¶ 11, ECF No. 90-18.

[7] It is undisputed that Renesas "raised a concern . . . that the **Retained Business** may need to use some of the intellectual property" that was licensed to EnOcean under the APA. Add. Fact No. 11 (emphasis added). The "Retained Business" is Renesas's "semiconductor and chipmaking businesses." Add. Fact No. 6. The Retained Business ***does not*** include products that use the Actian Software. APA Art. I (defining "Seller Retained Business"); *see also* Fact No. 25 (explaining that the "Business Products" transferred under the APA are distinct from Renesas's other products). Therefore, Renesas retained the intellectual property at issue in order to continue operating its own business, not to make, distribute, or sell products that use the Actian Software.

[8] Actian speculates that, because the Retained IP relates to the Business Products generally, the Retained IP must also be "assets" relating to the Actian Software. *See* Mot. at 12-14. But there is no evidence to support this speculation. The Business Products sold through the APA included products that *do not* use the Actian Software. Fact No. 26; Add. Fact No. 3. Actian has not offered any evidence that the Retained IP relates to products containing the Actian Software, as opposed to other Business Products that are not covered by the OEM Agreement. Actian has identified just a few trademarks that relate to products that may contain the Actian Software. *See*

At the motion hearing, Actian pivoted to a new concern not raised in its briefs. Actian argued that, because EnOcean only has a license to the Retained IP, EnOcean is powerless to prevent unauthorized use of the Actian Software by EnOcean's sublicensees and end users. In other words, because EnOcean cannot sue its distributors and customers for copyright infringement, the Actian Software (embedded in EnOcean's products) can be infringed without recourse. But the OEM Agreement does not require EnOcean to protect Actian's rights by suing for infringement of copyrights or other intellectual property. Instead, the OEM Agreement requires EnOcean to use "written agreements" or "shrink wrap" agreements to restrict downstream use of products that contain the Actian Software. OEM Agreement §§ 2.1, 2.2, 2.3.[9] These restrictions can be enforced under contract law. *See, e.g.*, *Laatz v. Zazzle, Inc.*, 682 F. Supp. 3d 791, 809 (N.D. Cal. 2023).

Finally, at the hearing, Actian predicted dire consequences if the Court were to hold that intellectual property rights are not significant assets of a software business. Of course, this concern is unfounded because the Court makes no such ruling. The issue before the Court is not whether intellectual property rights can *ever* be important assets of a software business. Instead, the parties presented a narrow, fact-specific question about the assets of the particular business that Renesas sold to EnOcean. Actian failed to produce evidence that specific copyrights, trade secrets, or patents relating to the products that contain the Actian Software were excluded from the APA. The undisputed evidence shows that EnOcean obtained the assets necessary to run the business – including contractual rights, inventory, tangible assets, hardware, design files, manufacturing files, and the source code utilized in the relevant products. Accordingly, the APA was a sale of substantially all assets to which the OEM Agreement relates, and EnOcean satisfied the first condition for obtaining a valid assignment of the OEM Agreement.

---

Fact Nos. 52-55. There is no evidence that an ownership interest in these trademarks was an important or material asset under the OEM Agreement.

[9] Actian also cited Section 10 of the OEM Agreement, but that section is an indemnity provision addressing the circumstances under which Actian or EnOcean will *defend* the other *against* infringement claims. OEM Agreement § 10. It does not require that Actian or EnOcean will assert their respective intellectual property rights against sublicensees or end users.

**B.     EnOcean Agreed in Writing to the Terms of the OEM Agreement**

The OEM Agreement also provides that an assignee of the OEM Agreement must "agree[] in writing to be bound by all the terms and conditions of [the OEM] Agreement."  OEM Agreement § 12.2.  It is undisputed that, under Section 2.3(b)(1) of the APA, EnOcean expressly assumed "the obligations of [Renesas] . . . under the Assumed Contracts," which is defined to include the OEM Agreement.  Because EnOcean assumed all obligations of Renesas under the OEM Agreement, it necessarily agreed to be bound by all of the terms and conditions of the OEM Agreement.  Moreover, this written agreement was made at the time the APA was executed, and Actian was informed about the assignment on October 2, 2022 – immediately after the APA transaction closed.  Therefore, there is no genuine dispute that this condition was satisfied at the time the assignment became effective.

In the alternative, the Court also finds that EnOcean satisfied this requirement in August 2023, when it provided additional written confirmation to Actian.  Sczesny Decl. ¶ 6, ECF No. 90-7.  Actian argues that this written agreement was inadequate because EnOcean did not assume obligations under the OEM Agreement *retrospectively* – that is, obligations that accrued prior to the APA closing date.  Instead, EnOcean agreed "to be bound by all the terms and conditions" of the OEM Agreement effective October 1, 2022, and "any obligations under the [OEM] Agreement prior to October 1, 2022, remain with" Renesas.[10]  Gu Decl. Ex. D, ECF No. 88-7.

Nothing in Section 12.2 or any other provision of the OEM Agreement expressly requires an assignee to assume all prior *liabilities* that accrued before the assignment.  Additionally, Actian's own conduct contradicts this construction.  *Acheson v. Falstaff Brewing Corp.*, 523 F.2d 1327, 1330 (9th Cir. 1975) ("[I]t is a fundamental rule of contract interpretation that great weight should be given [to] the interpretation of the contract by parties thereto.").  On March 10, 2023, after the APA was executed, Actian notified Renesas that its rights under the OEM Agreement were terminated in light of the assignment.  Defs.' Ex. 1, ECF No. 90-4.  Yet Actian took the

---

[10] EnOcean's agreement in the APA to assume Renesas's obligations under the OEM Agreement was made without qualification, and without disclaiming obligations that accrued prior to the assignment.

12

position that "the [t]ermination does not release Renesas from the obligation to pay any sum to Actian whether due before or after the Termination of the Agreement." *Id.*; *see also* Defs.' Ex. 3, ECF No. 90-6 (receipt reflecting that Renesas paid the royalties as requested); Add. Fact Nos. 24-26. Therefore, Actian viewed Renesas – not EnOcean – as responsible for pre-assignment obligations under the OEM Agreement. The Court may not read into the OEM Agreement a term for which Actian did not bargain, particularly when such a requirement is inconsistent with Actian's pre-litigation conduct. *See Carma Devs. (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 373-74 (1992) (in bank).

***

In sum, the Court finds no genuine dispute of material fact that the APA was a valid assignment of the rights to the Actian Software under the OEM Agreement, and EnOcean agreed in writing to be bound by all the terms and conditions of the OEM Agreement. Accordingly, EnOcean's motion is GRANTED and Actian's motion is DENIED.

### C. Actian's Motion to Seal is Denied

Actian filed an administrative motion to consider whether EnOcean's materials should be sealed in connection with Actian's opening summary judgment brief. Mot. to Seal, ECF No. 88. EnOcean did not file the required statement in support of sealing. *See* Civil L.R. 79-5(f)(3). At the hearing, the parties confirmed that these materials may be unsealed. Accordingly, the motion to seal is DENIED. Within 14 days of this Order, Actian shall publicly file unredacted and unsealed versions of the documents currently filed under seal at ECF No. 88.

## IV. CONCLUSION

For the foregoing reasons, EnOcean's motion for summary judgment is GRANTED and Actian's motion for summary judgment is DENIED.

Within 30 days of this Order, the parties shall conduct a further ADR session. *See* Am. Scheduling Order at 1, ECF No. 84. Within 7 days after the ADR session, the parties shall file a further case management statement. The statement shall confirm that the further ADR session was completed, state the outcome of the session, and provide the parties' proposals for further ADR efforts if the ADR session was unsuccessful. The statement shall propose a schedule for further

proceedings in this action. *Id*. at 2.

**IT IS SO ORDERED.**

Dated: September 19, 2025

                                                Eumi K. Lee
                                                United States District Judge